**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

RHONDA BURSTEIN,

             Plaintiff,

      -against-

HACHETTE BOOK GROUP, INC., HARPER
COLLINS PUBLISHERS, INC., MACMILLAN
PUBLISHERS, INC., PENGUIN GROUP (USA)
INC., SIMON & SCHUSTER, INC., RANDOM
HOUSE, INC., APPLE, INC., AMAZON.COM,
INC., and BARNES & NOBLE, INC,

            Defendants.

**CLASS ACTION COMPLAINT**

**JURY TRIAL DEMANDED**

11 cv 5621

## I.    INTRODUCTION

1.    This case challenges a horizontal conspiracy among the six largest book publishers in the United States - Hachette, HarperCollins, Macmillan, Penguin Group, Random House, and Simon & Schuster, (collectively, the "Publisher Defendants") and the three largest sellers of electronic books ("eBooks") in the United States -Apple, Amazon, and Barnes & Noble - to restrain trade in the consumer retail market for eBooks.

2.    The horizontal portion of the conspiracy constitutes per se illegal conduct in that the Publisher Defendants, Apple, Amazon, and Barnes & Noble agreed to raise, fix, stabilize and maintain the retail, consumer prices of the eBooks at an artificially high level.

3.    This case also challenges vertical restraints of trade that are an integral part of the horizontal conspiracy.  The Publisher Defendants, Apple, Amazon, and Barnes & Noble agreed to adopt a new, so-called "agency" distribution method (hereinafter the "agency model") that prohibits online retailers from deviating from the retail prices dictated by the publishers.

4.      In order to effectively carry out the conspiracy, Apple, Amazon, and Barnes & Noble each entered into "most favored nation" agreements with the Publisher Defendants.  These agreements prohibited the Publisher Defendants from entering into agreements with any other retailer to provide eBooks at more favorable terms.  Because these agreements unequivocally foreclose price competition with regard to eBook content, they constitute unreasonable restraints of trade that violate federal and state antitrust laws.

5.      The conspiracy has raised the price of new bestselling eBooks from $9.99 to an average of $12-$15 – an increase of 33 to 50 percent. The price of an eBook in many cases now approaches – or even exceeds – the price of the same book in paper even though there are almost no incremental costs to produce each additional eBook unit.

6.      In 2007, Amazon began to dominate the previously stagnant eBook industry with the introduction of its eBook reader, the Kindle.  Amazon set the price of many popular new books at $9.99.  This price was well below the price of print editions of the same titles.  Amazon adopted this pricing policy even though it often purchased titles at prices at or above $9.99.

7.      The Defendant Publishers viewed Amazon's pricing model as a threat to its traditional pricing model and believed that it would lead to a decline in the price of wholesale print books.  The low eBook prices also threatened to dramatically reduce sales at physical retail bookstores, such as Barnes & Noble.  However, as one published report states, "none of the publishers seemed to think that they could act alone, and if they presented a unified demand to Amazon they risked being charged with price-fixing and collusion."

8.      The introduction of Apple's iPad and Barnes & Noble's Nook provided an opportunity for the Defendant Publishers to align with retailers to drive up the cost of eBooks. Apple was unwilling to enter the eBook market if it had to compete with Amazon's low prices.

2

Similarly, Barnes & Noble was interested in the eBook market as a means to increase profit margins.

9.      When Apple announced the iPad's debut in late January 2010, Apple's CEO Steve Jobs indicated that Apple had agreements in place with five of the six largest publishing houses – Hachette Book Group, HarperCollins, Macmillan, Penguin, and Simon & Schuster – to provide eBook content for the new device using the agency model.  Each of the publishers would agree to the agency model and most favored nation treatment.

10.     Shortly after Apple's announcement, several of the Defendant Publishers encouraged Amazon to adopt the agency model for the sole purpose of driving up Amazon's eBook prices.  Amazon initially resisted, but then quickly entered the conspiracy and formed agreements with five Publisher Defendants to set prices through the agency model.  It would not have been in the independent self-interest of any single Publisher Defendant to implement a price increase without knowledge that most of the other Publisher Defendants would do the same.  A publisher that took this course alone would expect to lose market share to lower priced competitors.

11.     All of the agreements that Amazon entered into all contained most favored nation clauses.  Amazon knew that by entering into these agreements that it was setting a price floor for eBooks and that consumers would be forced to purchase eBooks at prices determined by the publishers.   Amazon also knew that it was entering into an agreement that ensured it would sell eBooks at the same price as Apple, Barnes & Noble, and any other eBook retailer.

12.     During the first week of April, when Apple launched the iPad, Barnes & Noble also reportedly confirmed that it was "moving to the agency model with publishers including Hachette, HarperCollins, Macmillan, Penguin, [and] Simon & Schuster."  The agreements that

3

Barnes & Noble entered into also all contained most favored nation clauses.  Barnes & Noble knew that by entering into these agreements that it was setting a price floor for eBooks and that consumers would be forced to purchase eBooks at prices determined by the publishers, absent the discounting in which retailers had previously engaged.  Barnes & Noble also knew that it was entering into an agreement that ensured it would sell eBooks at the same price as Apple, Amazon, and any other eBook retailer.

13.     By the time that Apple launched the iPad in April 2010, Amazon, Barnes & Noble, and Apple had each adopted the agency model.  This resulted directly from their concerted activity with the Publisher Defendants to raise, fix, and maintain eBook prices at supracompetitive levels.

14.     The only plausible way that five of the six Publisher Defendants could implement the agency pricing model in such a short time period and increase the price of books to identical price ranges is with prior discussion, agreement, and coordination.

15.     Random House's participation in the conspiracy came into full view no later than February 2011, when it announced that it would also implement the agency pricing model.  Random House then proceeded to raise the prices of its eBooks above $9.99, with most priced at $12.99 to $14.99.

16.      Defendants entered into a conspiracy that maximized their ability to fix prices and eliminated the risk that any party could abandon the conspiracy and return prices to a competitive level.  The agency model ensured that the Publisher Defendants could implement, monitor, and enforce the horizontal agreement to raise and fix retail prices by taking control of pricing decisions for their eBooks. At the same time, the most favored nations clauses provided a means for Apple, Amazon, and Barnes & Noble to

ensure that no other competitor would have access to lower priced eBooks.  The most favored nation clauses ensured that these defendants were insulated from price competition and faced no risk adhering to the prices set by publishers.

17.     Defendants were able to effectively engage in unlawful concerted activity because the eBook market is highly susceptible to a horizontal conspiracy.  The Publisher Defendants dominate the eBook market and meet regularly at trade associations where they exchange information on a range of topics, including copyright issues, piracy issues, author contracts and royalties, and, it can be inferred, also pricing issues.  Furthermore, Apple, Amazon, and Barnes & Noble list their prices in manner that is publicly available and easy to monitor.

## II.     PARTIES

### A.     Plaintiff

18.     Plaintiff, Rhonda Burstein, is an individual residing in the State of Florida. While in Florida, plaintiff purchased eBooks by Publisher Defendants and was subjected to agency pricing.  Plaintiff has been injured because she paid an artificially high and anticompetitive price as a result of the unlawful conduct alleged herein affecting the purchase price of eBooks.

19.     Plaintiff paid higher prices for eBooks (as defined *infra* ¶ 23) she acquired as a direct and foreseeable result of the unlawful conduct set forth herein.

### B.     Defendants

20.     Defendant Hachette Book Group, Inc. ("Hachette") is a leading U.S. trade publisher with its principal place of business at 237 Park Ave., New York, NY 10017. Its

5

imprints include Little, Brown & Co. and Grand Central Publishing, among others.
Hachette is owned by Hachette Livre, a French company.

21.     Defendant HarperCollins Publishers, Inc. ("HarperCollins") is a leading
U.S. trade publisher with its principal place of business at 10 East 53rd St., New York,
NY 10022. Its imprints include Ecco, Harper, Harper Perennial and William Morrow,
among others. HarperCollins is a subsidiary of News Corporation.

22.     Defendant Macmillan Publishers, Inc. ("Macmillan") is a group of leading
publishing companies with its principal place of business at 175 Fifth Ave., New York,
NY 10010. Its U.S. publishers/imprints include Farrar Straus and Giroux, Henry Holt &
Company, Picador, and St. Martin's Press, among others. Macmillan is held by
Verlagsgruppe Georg von Holtzbrinck, based in Stuttgart, Germany.

23.     Defendant Penguin Group (USA) Inc. ("Penguin") is the U.S. affiliate of
Penguin Group, one of the largest English-language trade book publishers in the world.
Penguin's principal place of business is at 375 Hudson St., New York, NY 10014. Its
imprints include Viking, Riverhead Books, Dutton and Penguin Books, among others.

24.     Defendant Simon & Schuster, Inc. ("Simon & Schuster") is a leading U.S.
trade publisher with its principal place of business at 1230 Avenue of the Americas, New
York, NY 10019. Its imprints include Simon & Schuster, Scribner, Atria and Gallery
Books, among others. Simon & Schuster is part of the CBS Corporation.

25.     Defendant Random House, Inc. ("Random House") is the United States
division of Random House, the world's largest trade-book publisher, and is owned by
Bertelsmann AG.  Its principal place of business at 1475 Broadway, New York, NY
10019.

26.     The foregoing Defendants – Macmillan, Simon & Schuster, Hachette Book Group, HarperCollins Publishers, Random House, and Penguin Group (USA), Inc. – are referred to collectively herein as "Publisher Defendants."

27.     Defendant Apple, Inc. ("Apple") is incorporated in the State of California, with principal offices in Cupertino, California. Apple does business throughout the United States and within this District, including the sale or delivery of substantial quantities of eBook readers and eBooks in this District.

28.     Defendant Amazon.com, Inc ("Amazon") is an online retailer of goods sold in North America and Internationally headquartered in Seattle, Washington.

29.     Defendant Barnes & Noble, Inc. ("Barnes & Noble"), the nation's largest bookseller, is incorporated in the State of Delaware and headquartered at 122 Fifth Avenue, New York, NY 10011.  Barnes & Noble transacts business throughout the United States.  All defendants, including Barnes & Noble, are collectively referred to as "Defendants."

## III.    JURISDICTION AND VENUE

30.     Plaintiffs bring this action pursuant to Sections 4 and 16 of the Clayton Act, 15 U.S.C. §§  15 and 26, to recover treble damages, injunctive relief, and the costs of this suit, including reasonable attorneys' fees, for injuries sustained by Plaintiffs and the Class (defined below) as a result of Defendants'  violations of Section 1 of the Sherman Act, 15 U.S.C. §1 as well as to enjoin defendants unlawful conduct

31.     This Court has jurisdiction pursuant to 28 U.S.C. §§ 1331, 1337, and 1367, and Sections 4 and 16 of the Clayton Act, 15 U.S.C. §§ 15(a) and 26, and pursuant to the principles of pendent jurisdiction.

32.     Venue is proper in this District pursuant to Sections 4, 12 and 16 of the Clayton Act, 15 U.S.C. §§ 15,22 and 26 and 28 U.S.C. § 1391(b), (c) and (d).  Venue is proper in this District because one or more of the Defendants resides, transacts business, is found or has agents in this District, because a part of the events giving rise to Plaintiffs' claims occurred in this District and a portion of the affected interstate trade and commerce, as described below, was carried out in this District.

33.     This Court has personal jurisdiction over each Defendant because, among other things, each Defendant: (a) has transacted business throughout the United States, including in this District, and continues to do so; (b) has delivered or sold substantial quantities of eBooks and other products throughout the United States, including in this District, and continues to do so; (c) had and has substantial contacts within the United States, including in this District; and (d) was and is engaged in antitrust conduct that was directed at, and had a direct, foreseeable, and intended effect of causing injury to the business or property of, persons residing in, located in or doing business throughout the United States, including in this District.

## IV.     MARKET POWER OVER EBOOK SALES

34.     eBooks constitute a relevant market.

35.     An eBook is an e-text that forms the digital media equivalent of a conventional print book.   eBooks have a number of unique and advantageous

characteristics that distinguish them as separate products from traditional, printed books. eBooks differ from traditional books in the means by which they are acquired, stored and carried.  eBooks can be bought instantly whenever and wherever an internet connection is available.  Because eBooks take up de minimis physical space, hundreds of eBooks can be stored and transported on a single electronic device.  eBooks also provide the ability to search the eBook electronically and adjust the size of the text.

36.     The production of eBooks is highly concentrated, including the six major trade publishers, who are the Publisher Defendants.  Barriers to market entry, including reputational barriers and exclusive contracts with popular authors, are substantial.  The structure of the market allows the Publisher Defendants to exercise market power and conspire unlawfully to profitably raise prices.

37.     The relevant geographic market for the purposes of this Complaint is the United States.

38.     A hypothetical monopolist that controlled the supply of eBooks would have the ability to raise the price of eBooks substantially for a significant period of time without consumers substituting another product. The many distinctions between eBooks and printed books are reflected in publicly available data indicating rapid growth in the sales of eReaders and eBooks, far outstripping the growth rates of printed books, indicating a paradigm product shift to eBooks by consumers.

## V.     INTERSTATE TRADE AND COMMERCE

39.     The activities of Defendants, as described in this Complaint, were within the flow of, and substantially affected, interstate commerce.  Defendants produced,

delivered and sold substantial quantities of eBooks and other products in a continuous

and uninterrupted flow of interstate commerce, including through and into this District.

The anti-competitive conduct in which the Defendants participated had a direct,

substantial and reasonably foreseeable effect on interstate commerce.

## VI.    INDUSTRY STRUCTURE

40.    An eBook is an electronic equivalent of a printed book.  eBooks are

usually read on hardware devices known as eReaders.  Popular eReaders include

Amazon's Kindle and Barnes & Noble's Nook.  Apple's iPad is a multifunction device

that can serve as an eReader.

41.    Amazon's entry in the eBook market was an unprecedented success.  Prior

to the launch of Amazon's Kindle in 2007, at least five previous eBook readers failed to

generate significant sales.  The Sony Reader was the only eReader to gain any foothold in

the eBook market.   At launch, Amazon offered approximately four times as many titles

as Sony, and sold its eBooks at a uniform lower cost, $9.99.  By 2009, the Kindle became

Amazon's top selling product in both unit sales and dollars. By mid-2010, Amazon sold

more e-books than hardcover books. In February 2011, the *New York Times* began to

report an eBook bestseller list in its book review section.

42.    Amazon sold eBooks at prices lower than traditional books and at times

for a loss.   For example, publishers generally charged Amazon about $13-$14 for the

newly released books that Amazon sold for $9.99.  Amazon was willing to establish this

price level to grow market share, and to generate profit off the sales of Kindles. Amazon

also knew that with sufficient buying power and efficiencies it could eventually reduce the surplus publishers were paid for eBooks.

43.     The low cost of eBooks was not merely a result of Amazon's strategic choices, but was also the result of the cost reductions associated with the production of eBooks.  Traditional print books involve costs that are not present for eBooks such as printing, binding, and shipping.  These cost reductions should result in lower prices in a competitive market.

44.     Amazon's aggressive and consumer-friendly pricing led to a dramatic increase in sales of eBooks.  Total eBook sales were approximately $61 million in 2008, $166 million in 2009, and $441 million in 2010.  The Kindle accounted for approximately 80% - 90% of eBook sales in 2010.

45.     eBook sales provided additional incremental unit sales over physical books.  eBooks also eliminated the need for consumers to frequent publishers' established customer base, i.e., physical book stores.

## VII.   UNLAWFUL AGREEMENT TO RESTRAIN TRADE OR COMMERCE

### A.   Apple and the Publisher Defendants Coordinate the Imposition of the Agency Model and Inflate the Price of eBooks

46.     The Publisher Defendants responded to the threat posed by Amazon's eBook pricing by pushing for the so called "agency model."  Public reports indicate that in January 2010, the Publisher Defendants had been talking for "months . . . about imposing an 'agency model' for eBooks," in order to drive up prices. However, "none of the publishers seemed to think that they could act alone, and if they presented a unified demand to Amazon they risked being charged with price-fixing and collusion."

11

47.     The agency model prohibits price competition among retailers. The model turns retailers into "agents" for the publishers that are forced to sell eBooks at prices set by the publishers.  The retailers/agents receive a commission on sales made to readers.

48.     Defendant Apple brokered the simultaneous switch to the agency model, and the Publisher Defendants agreed to standardize higher eBook prices. In a  January 2010 interview, Apple CEO Steve Jobs told Walt Mossberg of the *Wall Street Journal* that Amazon's $9.99 pricing for eBooks was soon to end:

> Mossberg:     Why should [a consumer] buy a book for $14.99 on your device when she can buy one for $9.99 from Amazon or Barnes & Noble?
>
> Jobs:            That won't be the case.
>
> Mossberg:     You won't be $14.99 or they won't be $9.99?
>
> Jobs:            *The prices will be the same . . . Publishers are actually withholding their books from Amazon because they're not happy.* (Emphasis added.)

49.     Absent Apple's knowledge of, and participation in, the unlawful conspiracy, Steve Jobs would not have been able to predict future eBook pricing with such startling accuracy.

50.     On January 23, 2010, industry newsletter *Publishers Lunch* reported that Apple had negotiated agreements with Hachette, HarperCollins, Macmillan, Penguin and Simon & Schuster to switch from a wholesaler-retailer model to an "agency model" for eBook sales.

51.     On January 27, 2010, Apple announced that it would launch the iPad in April 2010. The iPad is a multifunction device that can serve as an eReader.  Apple planned to sell eBooks for the iPad through its "iBookstore."

12

52.    When Apple announced the iPad's debut in January 2010, Steve Jobs indicated that Apple had agreements in place with five of the six largest publishing houses – Hachette Book Group, HarperCollins, Macmillan, Penguin, and Simon & Schuster – to provide eBook content for the new device using the agency model.  Apple takes a 30% commission on sales.

53.    The agreements set the prices of all eBooks ***above*** $9.99, with new releases and best sellers priced between $12.99 and $14.99.

54.    Each agreement between Apple and the Publisher Defendants contained a "most favored nation" clause. Pursuant to that clause, Apple and the Publisher Defendants agreed that no other party is permitted to offer eBooks at a cost lower than Apple.

55.    With the agreements in place, the Publisher Defendants were empowered to encourage Amazon to adopt the agency model and adhere to the unlawful scheme.

56.    In response, Amazon stopped selling Macmillan's titles that evening.  On Sunday, January 29, 2010, Amazon accepted Macmillan's proposal and announced via its website that "We will have to capitulate and accept Macmillan's terms because Macmillan has a monopoly over their own titles, and we will want to offer them to you even at prices we believe are needlessly high for e-books." Very soon after, Amazon entered into agency agreements with each of the four other major publishers that had signed on with Apple.

57.    The success of MacMillan's actions was dependant upon the support of the other publishers.  According to published reports, "[t]he head of another house said,

13

'Amazon was incandescent with rage. They switched because they figured out that if all publishers withdrew their books Amazon's business was dead.'"

58.     Hachette also encouraged Amazon to switch to the agency model.  On April 1, 2010, Amazon posted the following message on its website:  "[Hachette] has disallowed the sale of ebooks except on agency terms effective as of 12:01 am this morning.  We came to terms late last night but we cannot be operationally ready to sell their ebooks on agency terms until two days from now – April 3 – when we will also cut over for the other publishers that are switching to agency.   If we can get a two day extension from Hachette to continue selling their ebooks under the prior terms, we can have the Hachette ebooks promptly back for sale today.  If not, then they will be back on April 3."

59.     Penguin also encouraged Amazon to adopt the agency model.  On April 1, 2010, Penguin sent a letter to its agents and authors that read, in part:  "In recent weeks we have been in discussion with our retail partners who sell eBooks, including Amazon, to discuss our new terms of sale for eBooks in the U.S.  At the moment, we have reached an agreement with many of them, but unfortunately not Amazon – of course, we hope to in the future.  Your newly released eBook is currently not available on Amazon, but all of your eBooks released prior to April 1st are still for  sale on their site. . . .  Our conversations with Amazon are ongoing and we do hope to continue our long- term relationship with them."

60.     On information and belief, HarperCollins and Simon & Schuster similarly encouraged Amazon to adopt the agency model in the same time period.

14

61.     Each of the Publisher Defendants, save Random House, had implemented the agency model by the time Apple launched the iPad on April 3, 2010.

62.     The agreements with Amazon also contain most favored nation clauses which ensure that no competitor has access to lower prices or better terms than Amazon. Amazon was aware of the most favored nation clauses in Apple's agreements when it entered into its own agreements and was, in essence, agreeing to set prices at a level identical to Apple.

63.     The most favored nation clauses contained in Apple and Amazon's agreements with the Publisher Defendants established a price floor for eBooks.  Apple and Amazon have a decreased incentive to negotiate price discounts for customers because a publisher must offer those same prices to their rivals.

64.     By implementing the agency pricing model, Amazon joined the conspiracy and agreed to drive up and set the price of eBooks.  Through its interactions with the Publisher Defendants, Amazon knew that the Publisher Defendants were acting in concert to raise prices and chose to join in those unlawful efforts.  Amazon's agreement ensured that consumers would be denied the benefits of competition in the eBook marketplace.

65.     Apple conspired with the Publisher Defendants to ensure that eBooks would be sold at higher, uniform prices. Apple's imposition of the agency model would not have succeeded without the assurance provided by the most favored nation clauses that the Publisher Defendants would not allow their eBooks to be sold at lower prices.

66.     Amazon was well aware of the concerted action taken by Apple and the Publisher Defendants.  Amazon's initial resistance demonstrated that it viewed the

15

agency model as contrary to its independent economic interest.  Acting alone, Amazon sought to drive down prices to capture market share and profit off the sale of Kindles. Acting in concert with the Publisher Defendants, Apple and Amazon agreed to set uniform prices for eBooks.

### B.     Barnes & Noble Agrees to the Fixed Price

67.     Barnes & Noble entered the eBook market on October 21, 2009, when it released its eBook reader, the "Nook."

68.     Barnes & Noble currently controls approximately one-quarter of the U.S. market for eBooks.

69.     Barnes & Noble distributes digital content for the Nook under an agency pricing model, whereby publishers set fixed prices for eBooks and Barnes & Noble receives a fixed commission on content sold through its website, www.bn.com.  The commission Barnes & Noble receives generally amounts to 30 percent of the eBook price.

70.     Further, under the agency model, publishers enter into agreements with Barnes & Noble *not* to sell the same content to other retailers on more favorable terms. Because these agreements unequivocally foreclose price competition with regard to eBook content, they constitute unreasonable restraints of trade that violate federal and state antitrust law.

71.     As Barnes & Noble CFO Joseph Lombardi stated during a June 29, 2010 earnings call with investment analysts, "[i]n the agency model, the publisher determines that final selling price.  We don't deviate from that . . . Basically everybody's selling the book for the same publisher determined price."  The adoption of the agency model, he

16

added, guarantees not only near-uniform industry-wide pricing, but also "higher eBook margins . . . ."

72.    Indeed, during a June 21, 2011 earnings call, Barnes & Noble CEO William Lynch advised investors to "assume that as eContent sales expand and become a larger percentage of the total," Barnes & Noble's profit "margins will expand accordingly."

73.    Under the agency model, Barnes & Noble earns more money on some digital titles than on new hardcover sales.  For example, it sells the eBook edition of George R.R. Martin's best-seller "A Dance With Dragons" for $14.99, earning around $4.50 per sale.  It sells the hardcover edition for $21.34, earning less than $4 per sale, because under the traditional business model, it pays the publisher half the $35 list price.

74.    Barnes & Noble touts its "well-established relationships with publishers" as a factor that ensures a wide selection of titles and partly mitigates its inability or unwillingness to reduce eBook prices to competitive levels.

75.    Barnes & Noble has a well-established business relationship with Apple. Barnes & Noble sells its eReader software on Apple's "app store."

76.    During an August 24, 2010 earnings call with investment analysts, Barnes & Noble CEO William Lynch acknowledged that Barnes & Noble "partnered closely with Apple on" the eReader software.

77.    This business relationship between Barnes & Noble and Apple, which grew closer in 2010, included an anticompetitive agreement between the two to sell publisher-provided digital content at prices well above what Amazon had been charging for the same content before Apple introduced the iPad.

17

78.     In 2010, pursuant to this agreement, in direct and intentional coordination with Amazon, and in response to concerted pressure from the publisher Defendants, Barnes & Noble significantly increased the price of publisher-provided eBooks it sold.

79.     In 2010, the Barnes & Noble's price of a typical publisher-provided eBook increased from $9.99 to $12.99.  Thus, on Friday, April 2, 2010, the bn.com eBook prices for "Wolf Hall," by Hilary Mantel, and "The Help," by Kathryn Stockett, were raised from $9.99 to $12.99.  Demonstrating the collusion in the industry, Amazon implemented the same exact price increase for these two eBooks on the same day.

80.     The April 2, 2010, price increases coincided with the adoption by Barnes & Noble and Amazon of the agency model on that day.  In fact, these and other simultaneous eBook price increases were no coincidence.  They resulted directly from Defendants' concerted activity to raise, fix, and maintain eBook prices at supracompetitive levels.

81.     The agreements among Barnes & Noble, Apple, Amazon and the publisher Defendants have caused eBooks to be priced at virtually identical levels market-wide, depriving consumers of the benefit of competitive prices.

82.     During an August 24, 2010 earnings call, Barnes & Noble CEO William Lynch stated that the expense required to convert book content into digital format creates a "formidable barrier to entry for anyone. . . . It's why we continue to assert we only think there will be three, maybe four, big players in the eBook market over time."

83.     The high barriers to entering the eBook market help solidify the existing anticompetitive arrangements, preventing other companies from entering the market and pricing eBooks at competitive levels.

18

C.      **Random House Subsequently Agrees to the Fixed Price**

84.      Random House did not immediately join the conspiracy.  Random House was fully aware of the concerted action by the Publisher Defendants and Apple because it participated in the negotiations prior to the introduction of the iPad. Random House signaled a willingness to join at a later date by issuing a statement indicating it intended to continue its discussions with Apple.

85.      Throughout 2010, Random House continued to sell its eBooks pursuant to the traditional wholesaler-retailer model, and its eBooks were priced lower as a result. Also as a result, Apple refused to deal with Random House. This refusal to deal provides further evidence that Apple was a part of a conspiracy with the other Publisher Defendants and was doing its part to pressure Random House to join the conspiracy.

86.      On February 28, 2011, following additional discussions with Apple, Random House publicly signaled its joinder in the horizontal price fixing conspiracy when it announced that it would implement the agency model on March 1, 2011.

87.      Simultaneously with that implementation, Random House set the retail prices of its new release and bestseller eBook editions above the $9.99 price point. Most of these prices rose to between $12.99 and $14.99.

D.      **Governmental Antitrust Investigations**

88.      In mid-April 2010, the Texas Attorney General began to investigate the pricing practices in the e-book marketplace and Apple's entrance into that market. According to published reports, Hachette and Harper Collins admitted to being contacted.

89.      On July 29, 2010, the Connecticut Attorney General publically announced that he was investigating Amazon and Apple's e-book pricing practices.  In letters to

19

Apple and Amazon, the Connecticut Attorney General stated that he was "concerned that Apple and Amazon's decision to use the agency pricing model, coupled with the [most favored nation clauses], has already resulted in achieving or maintaining uniform prices for e-books, to the ultimate detriment of the consumer." News coverage of the Connecticut Attorney General's letter stated that the Justice Department's ongoing review of Apple's business practices extended to both Apple and Amazon's e-book deals.

90. On March 1, 2011, EU antitrust authorities raided several publishers in Europe searching for evidence that they acted illegally to raise prices.

### E. The Agency Model and Most Favored Nation Clauses Has Led to Artificially High and Stable Prices

91. Publisher Defendants have eliminated price competition among retailers for their eBooks through the agency agreements. As a result, Defendant Publishers have been able to set and maintain the cost of eBooks at artificially high levels.

92. The most favored nations agreements allow Apple, Amazon, and Barnes & Noble to sell eBooks at supracompetitive prices set by the Publisher Defendants without fear of losing sales. Through these agreements, Apple, Amazon, and Barnes & Noble have instituted a price floor and have left consumers with no choice but to pay inflated prices for eBooks.

### F. Under the Agency Model, the Retailers Serve Solely as Agents

93. The agency model is a scheme devised by the Publisher Defendants to eliminate the retailers' ability to set the price of eBooks. Plaintiff and Class Members deal with Apple, Amazon, and Barnes & Noble solely as agents of the Defendant Publishers.

94.     As agents, Apple, Amazon, and Barnes & Noble merely list the prices of eBooks set by Defendant Publishers and execute orders placed by consumers.  Amazon and Barnes & Noble clearly state on their websites that eBooks are being purchased from the specific publisher of the book.  Amazon admits that the publisher has set the price.  Similarly, Apples states that the "seller" of each eBook is the publisher of that eBook.

95.     The Defendant Publishers and Apple, Amazon, and Barnes & Noble agreed to allow the Defendant Publishers to fix the price at which eBooks are sold to Plaintiff and members of the Class.   Plaintiff and Class Members have no choice but to purchase eBooks directly from the level in the distribution chain - Apple, Amazon, and Barnes & Noble - at which the price of eBooks is fixed.

96.     Accordingly, for purposes of the antitrust claims brought by this Complaint, Plaintiff and Class Members purchased eBooks directly from the Publisher Defendants.

**G.     Antitrust Injury**

97.     The unlawful actions alleged herein have had, and are having, inter alia, the following effects:

a.     Prices charged by Defendants and their co-conspirators to Plaintiff and members of the Class for eBooks are maintained at artificially high and supra-competitive levels;

b.     Plaintiff and members of the Class were required to pay more for eBooks than they would have paid in a competitive market unfettered by Defendants' collusive and unlawful conduct; and

c.     Plaintiff and members of the Class have been deprived of the benefits of free, open and unrestricted competition in the market for eBooks.

98.     Plaintiff and members of the Class purchased eBooks directly in the United States from one or more of the Publisher Defendants' agents.

99.     Plaintiff and members of the Class paid more for eBooks than they would have paid under conditions of free and open competition.

100.    As a direct and proximate result of the illegal combination, contract or conspiracy alleged above, Plaintiff and members of the Class were injured and financially damaged in their business and property, in amounts that are not presently determined.

101.    The harm to Plaintiff and other members of the Class because of the artificially high pricing of eBooks amounts to many millions of dollars.

102.    This is antitrust injury of the type that the federal laws were meant to punish and prevent.

## VIII.  CLASS ALLEGATIONS

103.    This action has been brought, and may be properly maintained, under Federal Rules of Civil Procedure 23(a) (1)-(4), 23(b)(3).

104.    Plaintiff brings this action as a Class Action on behalf of herself and all others similarly situated as a member of a Class ("Class"), initially defined as follows:

> All persons who purchased eBooks of Publisher Defendants through Apple, Amazon, Barnes & Noble, or other eBook retailers subject to the Publisher Defendants' agency model pricing scheme, excluding Defendants, any entity in which defendants have a controlling interest, any of the officers, directors or employees of Defendants, the legal representatives, heirs, successors and assigns of Defendants.

105.    The members of the Class are so numerous and widely dispersed that joinder of them in one action is impractical.  On information and belief, that millions of Class Members have purchased eBooks at artificially high prices.

106.    There are common questions of law and fact as to all members of the Class that predominate over any questions affecting individual Class members, including:

a.    Whether Defendants unlawfully contracted, combined, and conspired to restrain trade in violation of Section 1 of the Sherman Act by agreeing to switch to the agency model of eBook pricing and agreeing to artificially fixing, raising, maintaining or stabilizing the prices of eBooks;

b.    Whether Defendants' actions in entering the agency agreements alleged above violated California Law;

c.    the identity of the participants in the alleged conduct;

d.    the acts carried out by Defendants;

e.    whether Plaintiff and Class members are entitled to damages, restitution, injunctive relief and declaratory relief;

f.    Whether Defendants should disgorge unlawful profits; and

g.    the appropriate class-wide measure of damages.

107.    Plaintiff's claims are typical of the Class she represents.  Both Plaintiff and the Class' claims arise out of the same course of conduct and same legal theories. Plaintiff challenges the practices and course of conduct engaged in by Defendants with respect to the Class as a whole.

108.    Plaintiff is an adequate representative of the Class because her interests do not conflict with the interests of Class members she seeks to represent.  Plaintiff has retained counsel competent and experienced in class action litigation who intend to vigorously prosecute this action.

23

109.    A class action is superior to other available methods for the fair and efficient adjudication of this controversy since joinder of all the Class members is impracticable.  Furthermore, no individual class member can justify the commitment of the large financial resources to vigorously prosecute a lawsuit against Defendants and the adjudication of this controversy through a class action will avoid the possibility of inconsistent and potentially conflicting adjudication of the claims asserted herein. There will be no difficulty in the management of this action as a class action.

**FIRST  CAUSE OF ACTION: VIOLATION OF THE SHERMAN ACT**
**(15 U.S.C. § 1) HORIZONTAL PRICE  FIXING**

(Against all Defendants)
(On behalf of the Class)

110.    Plaintiff incorporates by reference as if fully set forth herein the allegations contained in the preceding paragraphs of this Complaint.

111.    The Publisher Defendants and Apple have combined, conspired and/or contracted to restrain interstate trade in violations of Section 1 of the Sherman Act, 15 U.S.C. §1, and Section 4 of the Clayton Act, 15 U.S.C. § 15, by engaging in a horizontal agreement in restraint of trade.

112.    In furtherance of the conspiracy, each of the Publisher Defendants, Apple, Amazon, Barnes & Noble has committed overt acts, including, inter alia, agreeing to charge prices for consumers at agreed levels, carrying out that horizontal agreement by requiring retailers of eBooks to act only as agents and charged identical prices for particular books, and otherwise to fix, maintain and/or stabilize prices of eBooks sold in

the United States and communicating and agreeing with one another regarding the implementation of the agency model.

113.    The Publisher Defendants, Apple, Amazon, and Barnes & Noble engaged in these activities for the purpose of effectuating unlawful agreements to fix, maintain or stabilize prices of eBooks.

114.    Plaintiff and the members of the Class, therefore, have been injured and financially damaged in their respective businesses and property in an amount to be determined according to proof and are entitled to recover threefold the damages sustained pursuant to Section 4 of the Clayton Act, 15 U.S.C. § 15.

115.    The conduct of the Publisher Defendants, Apple, Amazon, and Barnes & Noble constitutes a per se violation of  Section 1 of the Sherman Act, 15 U.S.C. § 1.

**SECOND CAUSE OF ACTION: VIOLATION OF THE SHERMAN ACT (15 U.S.C. § 1) VERTICAL RESTRAINT OF TRADE**

(Against all Defendants)
(On behalf of the Class)

116.    Plaintiff incorporates by reference as if fully set forth herein the allegations contained in the preceding paragraphs of this Complaint.

117.    The Defendants have combined, conspired and entered into a horizontal agreement to restrain interstate trade in violations of Section 1  of the Sherman Act, 15 U.S.C. §1, and Section 4 of the Clayton Act, 15 U.S.C. § 1, as alleged above.

118.    In furtherance of their conspiracy, each of the Defendants has committed overt acts, including, inter alia, effectuating coercive and anticompetitive vertical arrangements with retailers requiring retailers to act only as the Publishers' agents and to

adhere to retail prices for eBooks as fixed by Publisher Defendants in coordination with Apple, Amazon, and Barnes & Noble.

119.    Plaintiff and the members of the Class, therefore, have been injured and financially damaged in their respective businesses and property in an amount to be determined, according to proof and are entitled to recover threefold the damages sustained pursuant to Section 4 of the Clayton Act, 15 U.S.C. § 15.

120.    The agency agreements between the Publisher Defendants and Apple, Amazon, Barnes & Noble and other retailers eliminated price competition in the retail trade eBooks market and eliminated competition among Defendants.

121.    The agency agreements and Defendants' acts and practices in furtherance thereof have no pro-competitive benefits. Even if there were any such benefits, they would not outweigh any of the anticompetitive effects described herein and, in any event, could be achieved by less restrictive means.

## REQUEST FOR RELIEF

**WHEREFORE**, Plaintiff prays as follows:

A.    That the Court determine that this action may be maintained as a class action under Rule 23 of the Federal Rules of Civil Procedure;

B.    That the conduct of Defendants be adjudged to have been in violation of Section 1 of the Sherman Act, 15 U.S.C. §1;

C.      That judgment be entered for Plaintiff and members of the Class against

Defendants for three times the amount of damages sustained by Plaintiff and the Class as

allowed by law, together with the costs of this action, including reasonable attorneys' fees;

D.      That Defendants, their affiliates, successors, transferees, assignees, heirs and the

officers, directors, partners, agents and employees thereof, and all other persons acting or

claiming to act on their behalf, be permanently enjoined and restrained from, continuing to

engage in the anticompetitive conduct described herein;

E.      That Plaintiff and members of the Class have such other, further and different

relief as the case may require and Court may deem just and proper under the circumstances.

## JURY TRIAL DEMANDED

Plaintiff hereby demands a trial by jury of all the claims asserted in this Complaint.

Dated: August 12, 2011                          Respectfully submitted,


                                                GRANT & EISENHOFER, PA


                                                Jay W. Eisenhofer
                                                Linda P. Nussbaum
                                                John D. Radice
                                                485 Lexington Avenue, 29th Floor
                                                New York, New York 10017
                                                Telephone: (646) 722-8500
                                                Fax: (646) 722-8501
                                                jeisenhofer@gelaw.com
                                                lnussbaum@gelaw.com
                                                jradice@gelaw.com

27

Michael E. Criden
Kevin B. Love
**CRIDEN & LOVE, P.A.**
7301 S.W. 57th Court, Suite 515
South Miami, Florida 33143
Telephone:  (305) 357-9010
Fax:  (305) 357-9050
mcriden@cridenlove.com
klove@cridenlove.com

***Attorneys for Plaintiff Rhonda Burstein***